Exhibit 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| DECKERS OUTDOOR CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 15-cv-3249 |
| | ) | |
| v. | ) | **Chief Judge Ruben Castillo** |
| | ) | |
| CHEN XIAO, et al., | ) | **Magistrate Judge Daniel G. Martin** |
| | ) | |
| | ) | |
| Defendants. | ) | |

## PRELIMINARY INJUNCTION ORDER

THIS CAUSE being before the Court on Plaintiff Deckers Outdoor Corporation's ("Deckers") Motion for Entry of a Preliminary Injunction, and this Court having heard the evidence before it hereby GRANTS Plaintiff's Motion for Entry of a Preliminary Injunction in its entirety against the defendants identified in Schedule A attached hereto (collectively, the "Defendants").

THIS COURT HEREBY FINDS that it has personal jurisdiction over Defendants since Defendants directly target their business activities toward consumers in the United States, including Illinois. Specifically, Defendants are reaching out to do business with Illinois residents by operating one or more commercial, interactive Internet stores through which Illinois residents can purchase products bearing counterfeit versions of Deckers' UGG Trademarks(a list of which is included in the below chart).

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| 3,050,925 | UGG | January 24, 2006 | For: Men's, women's and children's footwear, namely, boots, shoes, clogs, slippers; men's, women's and children's clothing, namely, coats, jackets; children's buntings in class 025. |
| 3,636,029 |  | June 9, 2009 | For: Leather bags in class 018. |
| 3,825,543 |  | July 27, 2010 | For: Coats; Jackets; Vests; Ponchos; Gloves; Mittens; Headwear; Wraps; Scarves; Sweaters in class 025. |
| 3,624,595 |  | May 19, 2009 | For: Footwear in class 025. |
| 4,234,396 | UGG | October 30, 2012 | For: footwear; clothing, namely, sweaters, coats, jackets, vests, ponchos, snow suits, scarves and gloves; headwear; children's buntings in class 025. |

THIS COURT FURTHER FINDS that injunctive relief previously granted in the Temporary Restraining Order ("TRO") should remain in place through the pendency of this litigation and that issuing this Preliminary Injunction is warranted under Federal Rule of Civil Procedure 65. Evidence submitted in support of this Motion and in support of Deckers' previously granted Motion for Entry of a Temporary Restraining Order establishes that Deckers has a likelihood of success on the merits; that no remedy at law exists; and that Deckers will suffer irreparable harm if the injunction is not granted. Specifically, Deckers has proved a *prima facie* case of trademark infringement because (1) the UGG Trademarks are distinctive marks and are registered with the U.S. Patent and Trademark Office on the Principal Register, (2) Defendants are not licensed or authorized to use any of the UGG Trademarks, and (3)

Defendants' use of the UGG Trademarks is causing a likelihood of confusion as to the origin or sponsorship of Defendants' products with Deckers. Deckers has also proved a *prima facie* case of violations of the Anticybersquatting Consumer Protection Act of 1996 ("ACPA") because it has demonstrated that Defendants have bad faith intent to profit from the UGG Trademarks and have registered, trafficked in, or used domain names that are identical or confusingly similar to or dilutive of Deckers' distinctive and famous UGG Trademarks. Furthermore, Defendants' continued and unauthorized use of the UGG Trademarks irreparably harms Deckers through diminished goodwill and brand confidence, damage to Deckers' reputation, loss of exclusivity, and loss of future sales. Monetary damages fail to address such damage and, therefore, Deckers has an inadequate remedy at law. Moreover, the public interest is served by entry of this Preliminary Injunction to dispel the public confusion created by Defendants' actions. As such, this Court orders that:

1.  Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under or in active concert with them be preliminarily enjoined and restrained from:

    a.  using Deckers' UGG Trademarks or any reproductions, counterfeit copies or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a genuine UGG Product or not authorized by Deckers to be sold in connection with Deckers' UGG Trademarks;

    b.  passing off, inducing, or enabling others to sell or pass off any product as a genuine UGG Product or any other product produced by Deckers, that is not Deckers' or not

produced under the authorization, control or supervision of Deckers and approved by Deckers for sale under Deckers' UGG Trademarks;

c. committing any acts calculated to cause consumers to believe that Defendants' products are those sold under the authorization, control or supervision of Deckers, or are sponsored by, approved by, or otherwise connected with Deckers;

d. further infringing Deckers' UGG Trademarks and damaging Deckers' goodwill;

e. otherwise competing unfairly with Deckers in any manner;

f. shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Deckers, nor authorized by Deckers to be sold or offered for sale, and which bear any of Deckers' UGG Trademarks or any reproductions, counterfeit copies or colorable imitations thereof;

g. using, linking to, transferring, selling, exercising control over, or otherwise owning the Online Marketplace Accounts, the Defendant Domain Names, or any other domain name or online marketplace account that is being used to sell or is the means by which Defendants could continue to sell Counterfeit UGG Products; and

h. operating and/or hosting websites at the Defendant Domain Names and any other domain names registered or operated by Defendants that are involved with the distribution, marketing, advertising, offering for sale, or sale of any product bearing Deckers' UGG Trademarks or any reproductions, counterfeit copies or colorable imitations thereof that is not a genuine UGG Product or not authorized by Deckers to be sold in connection with Deckers' UGG Trademarks.

4

2.      Each Defendant, within fourteen (14) days after receiving notice of this Order, shall serve upon Deckers a written report under oath providing: (a) their true name and physical address, (b) all websites and online marketplace accounts on any platform that they own and/or operate (c) their financial accounts, including all PayPal accounts, and (d) the steps taken by each Defendant to comply with paragraph 1, a through h, above.

3.      The domain name registries for the Defendant Domain Names, including, but not limited to, VeriSign, Inc., Neustar, Inc., Afilias Limited, CentralNic, Nominet, and the Public Interest Registry, within three (3) business days of receipt of this Order, shall, at Deckers' choosing:

   a.   unlock and change the registrar of record for the Defendant Domain Names to a registrar of Deckers' selection until further ordered by this Court, and the domain name registrars shall take any steps necessary to transfer the Defendant Domain Names to a registrar of Deckers' selection until further ordered by this Court; or

   b.   disable the Defendant Domain Names and make them inactive and untransferable until further ordered by this Court.

4.      Those in privity with Defendants and with actual notice of this Order, including any online marketplaces such as iOffer and Alibaba Group Holding Ltd., Alipay.com Co., Ltd. and any related Alibaba entities (collectively, "Alibaba"), social media platforms, Facebook, YouTube, LinkedIn, Twitter, Internet search engines such as Google, Bing and Yahoo, web hosts for the Defendant Domain Names, and domain name registrars, shall within three (3) business days of receipt of this Order:

a.  disable and cease providing services for any accounts through which Defendants engage in the sale of counterfeit and infringing goods using the UGG Trademarks, including any accounts associated with the Defendants listed on Schedule A;

b.  disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit and infringing goods using the UGG Trademarks; and

c.  take all steps necessary to prevent links to the Defendant Domain Names identified on Schedule A from displaying in search results, including, but not limited to, removing links to the Defendant Domain Names from any search index.

5.  Defendants and any third party with actual notice of this Order who is providing services for any of the Defendants, or in connection with any of the Defendants' websites at the Defendant Domain Names or other websites operated by Defendants, including, without limitation, any online marketplace platforms such as iOffer and Alibaba, advertisers, Facebook, Internet Service Providers ("ISP"), web hosts, back-end service providers, web designers, sponsored search engine or ad-word providers, banks, merchant account providers including PayPal, Alibaba, Western Union, third party processors and other payment processing service providers, shippers, and domain name registrars (collectively, the "Third Party Providers") shall, within five (5) business days after receipt of such notice, provide to Deckers expedited discovery, including copies of all documents and records in such person's or entity's possession or control relating to:

a.  The identities and addresses of Defendants, their agents, servants, employees, confederates, attorneys, and any persons acting in concert or participation with them including all know contact information;

    b. The nature of Defendants' operations and all associated sales and financial information, including, without limitation, identifying information associated with the Online Marketplace Accounts, the Defendant Domain Names, and Defendants' financial accounts, as well as providing a full accounting of Defendants' sales and listing history related to their respective Online Marketplace Accounts and Defendant Domain Names;

    c. Defendants' websites and/or any Online Marketplace Accounts;

    d. The Defendant Domain Names or any domain name registered by Defendants; and

    e. Any financial accounts owned or controlled by Defendants, including their agents, servants, employees, confederates, attorneys, and any persons acting in concert or participation with them, including such accounts residing with or under the control of any banks, savings and loan associations, payment processors or other financial institutions including, without limitation, PayPal, Alibaba, Western Union, or other merchant account providers, payment providers, third party processors, and credit card associations (e.g., MasterCard and VISA).

6. Defendants and any persons in active concert or participation with them who have actual notice of this Order shall be temporarily and preliminarily restrained and enjoined from transferring or disposing of any money or other of Defendants' assets until further ordered by this Court.

7. Western Union shall, within two (2) business days of receipt of this Order, block any Western Union money transfers and funds from being received by the Defendants identified in Schedule A until further ordered by this Court.

8.      PayPal, Inc. ("PayPal") shall, within two (2) business days of receipt of this Order, for any Defendant or any of Defendants' Online Marketplace Accounts or websites:

     a.    Locate all accounts and funds connected to Defendants, Defendants' Online Marketplace Accounts or Defendants' websites, including, but not limited to, any PayPal accounts connected to the information listed in Schedule A hereto, the email addresses identified in Exhibits 22 and 23 to the Declaration of Graham Thatcher, and any email addresses provided for Defendants by third parties; and

     b.    Restrain and enjoin any such accounts or funds that are China or Hong Kong based from transferring or disposing of any money or other of Defendants' assets until further ordered by this Court.

9.      Any banks, savings and loan associations, payment processors, or other financial institutions, for any Defendant or any of Defendants' Online Marketplace Accounts or websites, shall within two (2) business days of receipt of this Order:

     a.    Locate all accounts and funds connected to Defendants, Defendants' Online Marketplace Accounts or Defendants' websites, including, but not limited to, any accounts connected to the information listed in Schedule A hereto, the email addresses identified in Exhibits 22 and 23 to the Declaration of Graham Thatcher, and any email addresses provided for Defendants by third parties; and

     b.    Restrain and enjoin such accounts from receiving, transferring or disposing of any money or other of Defendants' assets until further ordered by this Court.

10.      Deckers may provide notice of these proceedings to Defendants, including service of process pursuant to Fed.R.Civ.P. 4(f)(3), by electronically publishing a link to the Amended Complaint, this Order and other relevant documents on a website to which the

Defendant Domain Names which are transferred to Deckers' control will redirect, or by sending an e-mail to the e-mail addresses identified in Exhibits 22 and 23 to the Declaration of Graham Thatcher and any e-mail addresses provided for Defendants by third parties that includes a link to said website. The Clerk of Court is directed to issue a single original summons in the name of "Chen Xiao and all other Defendants identified in the Amended Complaint" that shall apply to all Defendants. The combination of providing notice via electronic publication or e-mail, along with any notice that Defendants receive from domain name registrars and payment processors, shall constitute notice reasonably calculated under all circumstances to apprise Defendants of the pendency of the action and afford them the opportunity to present their objections.

11. Plaintiff's Amended Complaint, Schedule A to the Amended Complaint, Exhibits 22 and 23 to the Declaration of Graham Thatcher, and the TRO are unsealed.

12. Any Defendants that are subject to this Order may appear and move to dissolve or modify the Order on two days' notice to Deckers or on shorter notice as set by this Court.

13. The $10,000 bond posted by Deckers shall remain with the Court until a Final disposition of this case or until this Preliminary Injunction is terminated.

DATED: May 6, 2015

_____
U.S. District Court Chief Judge Ruben Castillo

9

Not Reported in F.Supp.2d, 2001 WL 527404 (N.D.Ill.)
**(Cite as: 2001 WL 527404 (N.D.Ill.))**

**H**

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern
Division.
CHARTER NATIONAL BANK AND TRUST,
Plaintiff,
v.
CHARTER ONE FINANCIAL, INC., Charter One
Bank, FSB and St. Paul Federal Bank for Savings,
Defendants.

No. 01 C 0905.
May 15, 2001.

*MEMORANDUM, OPINION AND ORDER*
ANDERSEN, J.
**\*1** This case is before the Court on the Motion
for a Temporary Restraining Order brought by
plaintiff Charter National Bank and Trust. Charter
National seeks to restrain Charter One Financial,
Inc ., Charter One Bank, FSB and St. Paul Federal
Bank for Savings from operating any location in the
Chicago metropolitan area using the mark
"charter." For the following reasons, Charter Na-
tional's motion is granted in part and denied in part.

*ALLEGED FACTS*
Northwest Bankcorp acquired a bank in Han-
over Park and renamed it Charter Bank and Trust of
Illinois on October 1, 1987. In 1993, two more loc-
ations were added, one in Schaumburg and one in
Hoffman Estates. Charter Bank and Trust of Illinois
changed its name to Charter Bank and Trust, N.A.
and then to Charter National Bank and Trust
("Charter National"). Since 1987, the entity now
known as Charter National has continuously oper-
ated the Hanover Park facility and has displayed a
large sign out front with the words "Charter Bank".
Since 1993, the Hoffman Estates and Schaumburg
branches have displayed large signs with the words
"Charter Bank".

Charter One did not do business in the State of
Illinois until it acquired St. Paul Federal Bank for
Savings in 1999. Until January of 2001 it operated
St. Paul's fifty-eight Chicago metropolitan locations
under the trade name and trademark "St. Paul". In
January of 2001, St. Paul announced that it was
changing its name to Charter One Bank. On Febru-
ary 6, 2001, counsel for Charter National faxed a
letter to Charter One informing Charter One of its
contention that Charter National was the senior
common law user in Chicago and that the name
change was already causing customer confusion.

After Charter One did not stop converting
branches from the mark "St. Paul" to "Charter
One", Charter National filed the instant lawsuit.
The issues have been extensively briefed and we
have conducted an evidentiary hearing. While this
court has reviewed the motion for a temporary re-
straining order, defendants have agreed to refrain
from displaying the name "Charter One" in the geo-
graphic area surrounding Charter National's three
branches.

*DISCUSSION*
The purpose of preliminary injunctive relief is
"to minimize the hardship to the parties pending the
ultimate resolution of the lawsuit." *Platinum Home
Mortgage Corp. v. Platinum Financial Group Inc.,*
149 F.3d 722, 726 (7th Cir.1998). The standards for
a temporary restraining order and the standards for
a preliminary injunction are identical. *Atkins v. Ar-
son Pirie Scott & Co., Inc.,* 1999 WL 1249342 at \*1
(N.D.Ill.Dec. 13, 1999). Therefore, a TRO is war-
ranted if the party seeking the injunction can make
a threshold showing that: (1) the case has a reason-
able likelihood of success on the merits; (2) no ad-
equate remedy at law exists; (3) it will suffer irre-
parable harm if the injunction is not granted; (4) the
balance of hardships is in favor of the moving
party; and (5) the preliminary injunction will not
harm the public interest. *Rust Environment & Infra-
structure, Inc. v. Teunissen,* 131 F.3d 1210, 1213
(7th Cir.1997).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 527404 (N.D.Ill.)
**(Cite as: 2001 WL 527404 (N.D.Ill.))**

**\*2** "Trademark law aims to aid consumers in identifying the source of goods by allowing producers the exclusive right to particular identifying words or symbols which they may attach to their products as a designator of source." *Thomas & Betts Corp. v. Panduit Corp.,* 65 F.3d 654, 657 (7th Cir.1995).

Charter National has shown a reasonable likelihood of success on the merits. In order to show a reasonable likelihood of success on the merits in a trademark infringement claim, the plaintiff must demonstrate: (1) the validity of its trademark and (2) the infringement of that mark. *Echo Travel, Inc. v. Travel Associates, Inc.,* 870 F.2d 1264, 1266 (7th Cir.1989). The validity of a mark is established by showing that a "word, term, name, symbol or device" is entitled to protection because that mark specifically identifies and distinguished one company's goods from those of its competitors. *Platinum,* 149 F.3d at 726. Charter National is the senior user of the mark in the Chicago metropolitan area. Although Charter One has registered its mark at the U.S. Patent and Trademark Office, that trademark only allows it to use its mark if no other senior user, who has been continuously using the mark, has priority. 15 U.S.C. § 1065. A trademark application is always subject to previously established common law rights of another party. *The Money Store v. Harriscorp Fin.,* 689 F.2d 666, 672 (7.th Cir1982). Therefore, if "Charter National Bank" is protectable under common law trademark law, Charter National has a reasonable likelihood of success on the merits.

Charter National contends that its mark is protectable because the term "charter" is more than a generic term, such as bank. Charter One argues that the mark is not protectable because it simply signifies that the bank has been certified, or chartered, by the state or federal government. We disagree. "Charter National Bank" is entitled to protection.

The determination of whether a party has established a protectable right in a trademark is made on a case by case basis, considering the totality of the circumstances. *New West Corp. v. NYM Co. of Cal., Inc.,* 595 F.2d 1194, 1200 (9 th Cir.1979). A party may acquire a protectable right simply through the use of the mark in connection with goods or services. *Zazu Designs v. L'Oreal,* S.A., 979 F.2d 499, 503 (7 th Cir.1992). We find that Charter National has shown a reasonable likelihood of success in its claim to have acquired a protectable right in "Charter National" through its evidentiary submissions of advertising brochures, ads, and pictures of signs, as well as its evidence of actual confusion. Later in the course of this case, Charter National will have to present more substantial evidence of confusion, but at this point the evidence it has presented is sufficient to convince this court that there is a reasonable likelihood of success in showing that its name has acquired a secondary meaning in the minds of customers and, therefore, deserves protection.

**\*3** In a trademark infringement case, damages are by "their very nature irreparable and not susceptible of adequate measurement for remedy at law." *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1092 (7 th Cir.1988). Charter National has shown a reasonable likelihood of success on the merits because of customer confusion and frustration. Furthermore, the fact that it is virtually impossible to calculate the financial impact of these damages shows that there is no adequate remedy at law.

Balancing of the hardships and the public's interest presents the closest question here. Defendants operate over seventy locations in the entire Chicago metropolitan region and forcing them to cover all of their signs on all banks is a hardship. However, they knew of this potential conflict before they changed the names of their banking operations from St. Paul to Charter One.

We have considered different geographical parameters for a temporary restraining order. Eighty percent of Charter National's deposit customers are clustered within three miles around its branches. Therefore, we have entertained the option

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 527404 (N.D.Ill.)

**(Cite as: 2001 WL 527404 (N.D.Ill.))**

of structuring a TRO to include that geographic area. In response, Charter National argued that it makes a profit only by virtue of the loans that it makes and, since its loan customers live in a much broader geographic area than its deposit customers, its damages will not by redressed unless we totally enjoin Charter One from any use of the mark "charter" in the entire Chicago metropolitan area. In the event that we determine that a preliminary injunction is justified, we might require that Charter One stop using the mark "charter" in the entire Chicago metropolitan area. However, given the balancing of the hardships at this stage in the litigation and the inconvenience to Charter One's hundreds of thousands of customers in the Chicago area, we will not order Charter One to stop using the mark "charter" in the entire metropolitan area.

We have fashioned a remedy which balances the public interests and the hardships, but still recognizes Charter National's likelihood of succeeding on the ultimate merits. We will restrain Charter One entities from operating any type of bank facility using the word "charter" on any outdoor sign within the geographic area between Lake Cook Road, on the north, I 290/I355/Illinois 53, on the east, North Avenue, on the south, and the Fox River, on the west. Furthermore, we will enjoin Charter One from opening any new locations, in the above geographic area, which use the mark "charter" in any way or is identified as "Charter One". This solution balances the strength of Charter National's mark in a smaller geographic area against the hardship of Charter One changing all of the signs on all of its facilities in the Chicago area on a temporary basis.

*CONCLUSION*

Charter National Bank & Trust's motion for a temporary restraining order is granted in part and denied in part. Charter One Financial, Inc., Charter One Bank, FSB and St. Paul Federal Bank for Savings are enjoined from operating any type of bank facility using the word "charter" on any outdoor signs within the geographic area between Lake

Cook Road, on the north, I 290/I355/Illinois 53, on the east, North Avenue, on the south, and the Fox River, on the west. Furthermore, Charter One is enjoined from opening any new locations in that geographic area that use the mark "charter" in any way or is identified as "Charter One". Charter National's request for a temporary restraining order prohibiting Charter One from using the mark "charter" throughout the entire Chicago metropolitan area is denied.

**\*4** It is so ordered.

N.D.Ill.,2001.
Charter National Bank and Trust v. Charter One Financial, Inc.
Not Reported in F.Supp.2d, 2001 WL 527404 (N.D.Ill.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)
**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois,
Eastern Division.
LORILLARD TOBACCO COMPANY, a Delaware
Corporation, Plaintiff,
v.
MONTROSE WHOLESALE CANDIES and Sundries, Inc., et al., Defendants.

Nos. 03 C 4844, 03 C 5311.
Nov. 8, 2005.

John S. Pacocha, Cameron Matthew Nelson, Jeffrey
G. Mote, Kevin D. Finger, Greenberg Traurig, LLP,
Chicago, IL, for Plaintiff.

Robert A. Egan, Robert A. Egan P.C., Robert A.
Hobib, Chicago, IL, for Defendants.

### REPORT AND RECOMMENDATION

MARVIN E. ASPEN, Judge.

*1 Plaintiff, Lorillard Tobacco Company
("Lorillard"), moves to freeze the assets of defendants Reza and Sandra Hazemi This matter originally came before me as a motion to freeze the assets
of the Hazemis and Montrose Wholesale Candies
and Sundries, Inc. ("Montrose")(collectively,
"Montrose defendants"). Judge Aspen had referred
that motion to Magistrate Judge Keys, and the referral was subsequently transferred to me. Accordingly, the court addresses Lorillard's motion for an
order freezing the Hazemis' assets in this Report
and Recommendation pursuant to 28 U.S.C. §
636(b)(1)(B).[FN1]

> FN1. Under 28 U.S.C. § 636(b)(1)(A), "a
> judge may designate a magistrate judge to
> hear and determine any pretrial matter
> pending before the court, *except a motion
> for injunctive relief,* for judgment on the
> pleadings, for summary judgment, to dis-

miss or quash an indictment or information
made by the defendant, to suppress evidence in a criminal case, to dismiss or to
permit maintenance of a class action, to
dismiss for failure to state a claim upon
which relief can be granted, and to involuntarily dismiss an action." Under section
636(b)(1)(B), "a judge may also designate
a magistrate judge to conduct hearings, including evidentiary hearings, and to submit
to a judge of the court *proposed findings of
fact and recommendations for the disposition,* by a judge of the court, of any motion
excepted in subparagraph (A). Lorillard's
motion to freeze assets is a motion for injunctive relief..

### I. BACKGROUND

Lorillard is one of the largest cigarette manufacturers in the United States and its brand, Newport, is the best-selling menthol cigarette in the
country. Lorillard has registered the trademark,
Newport, with the United States Patent and Trademark Office, giving it the exclusive right to manufacture, distribute, advertise, and sell Newport cigarettes in the United States. Lorillard distributes
its cigarettes through a network of wholesalers and
retailers, subject to a wide range of state and federal regulations. Over the past several years, the federal government and many states have substantially
increased taxes on cigarettes and other tobacco
products, which has made it profitable for
"bootleggers" to sell counterfeit tobacco products,
as well as import and distribute tobacco products in
a manner designed to avoid paying the taxes,
thereby reaping a handsome, but ill-gotten reward.

In July of 2003, one of Lorillard's division
managers paid a call on the Montrose store in
Chicago, Illinois, and purchased a carton of what he
suspected to be counterfeit Newport cigarettes, and
sent it for inspection to Lorillard's offices in
Greensboro, North Carolina. There, a quality assurance inspection convinced Lorillard that the cigar-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)
**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

ettes were counterfeit and it filed this suit against Montrose on July 14, 2003, alleging trademark violations under the Lanham Act 15 U.S.C. § 1051, *et seq.,* as well as various Illinois statutory violations and common law offenses. On July 15, 2003, Judge Marvin Aspen granted Lorillard's application for an ex parte seizure order allowing Lorillard to seize any counterfeit cigarettes, as well as records documenting the manufacture, importation, purchase, sale, distribution, or receipt of any merchandise bearing any Lorillard marks. The United States Marshals Service returned service on the seizure of four cartons of "counterfeit cigarettes and documents" on July 16, 2003. Montrose's owners, Reza and Sandra Hazemi, have since been added as defendants.

After enduring a maddening course of fruitless attempts at garnering any meaningful discovery from Montrose and the Hazemis, and becoming understandably suspicious that the Hazemis were looting Montrose's assets, Lorillard filed a motion to compel discovery and to freeze the assets of Montrose and the Hazemis, supporting it with over 1200 pages of documents detailing what Lorillard has learned, and has had to endure, over a year-and-a-half.[FN2] In the interim, however, and less than a week after being informed that the court was preparing to rule on Lorillard's motions, Montrose filed a Chapter 11 bankruptcy petition in the Bankruptcy Court for the Northern District of Illinois on September 7, 2005. This stayed the proceedings as to the corporate defendant.[FN3] On September 9, 2005, the Hazemis filed a motion before me to stay these proceedings as to them, which I denied on the grounds that I did not have the authority to rule on the motion and that it should have been filed before Judge Aspen. To date, the Hazemis have not filed an appropriate motion before Judge Aspen.

FN2. To support its motions, Lorillard filed the exhibits mentioned, as well as: (1) a declaration, (2) a substitute declaration, (3) a second declaration by Lorillard's counsel, (4) a declaration in support of the

emergency motion, and (5) the actual motions and supporting memoranda. Through a good portion of the declarations and the memoranda, however, Lorillard fails to cite to pages of the voluminous record that support many of its assertions. Thus, in some instances, Lorillard often merely directs the court to entire 200-plus-page deposition transcripts or 100-page business transactions to locate specific quotes. (*See, e.g.,* Combined Motion to Compel Discovery and Freeze Assets, at 4(¶¶ 6-7); (Substitute) Declaration of Jeffrey Mote, ¶¶ 10-11, 14-15, 22, 39; Second Declaration of Jeffrey Mote, at ¶¶ 22, 34). In other instances, it does not even provide a general reference to any supporting documentation (*See, e.g.,* (Substitute)Declaration of Jeffrey Mote, ¶¶ 28-29, 32-34, 41, 42, 43, 44) or-more understandably given the volume of materials prepared-misidentifies purported supporting materials or fails to make pages part of the record. (*See, e.g.,* Combined Motion to Compel Discovery and Freeze Assets, at 6(¶ 12); (Substitute)Declaration of Jeffrey Mote, at ¶¶ 28-29, 32-34, 41, 42, 43, 44; Second Declaration of Jeffrey Mote, at ¶¶ 22, 64, 65). At the court's request, Lorillard's counsel filed a consolidated declaration which corrected some, but not all, of these deficiencies. The few that remain, however, do not make Lorillard's tale of woe any less compelling; those assertions that Lorillard does adequately support with evidence and the court's own perusal of the record provide enough detail regarding the Montrose defendants' discovery obfuscation and financial legerdemain for the court to grant Lorillard's motion.

FN3. On November 1, 2005, Bankruptcy Court Judge Hollis granted Lorillard's motion to modify the automatic stay to permit Lorillard to continue its lawsuit against the

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)
**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

corporate defendant, Montrose.

**\*2** On October 31, 2005, Lorillard filed an emergency motion to freeze the assets of the individual defendants Ray and Sandra Hazemi. Lorillard's motion was prompted by its discovery that the Hazemis own certain property at 3019 N. Rose St. in Franklin Park, Illinois, despite the Hazemis' repeated denials, under oath, to the contrary. As it happens, this is merely the most recent installment in a continuing saga of deception, obfuscation, shuffling of assets, and corporate looting. While the evidence demonstrates that this has long been the Hazemi's pattern of doing business, it most recently has been calculated to place the Hazemi's assets beyond the reach of Lorillard. This most recent revelation regarding the property at 3019 N. Rose St. demonstrates that Mr. Hazemi has not only given what appears to be perjured deposition testimony, but made bald misrepresentations to the court regarding their ownership of the property. When examined in insolation, this episode alone would be sufficient to support an order freezing their assets. But when examined in context of what has gone on before, there can be no question that such an order is warranted.

## A

### The Hazemis' Misrepresentations Regarding Their Ownership of the Property at 3019 N. Rose St.

During its long and arduous discovery experience in this case, Lorillard has brought several motions to obtain compliance with subpoenas served on various third parties, including a business located at 3019 N. Rose Street in Franklin Park, Illinois (the "3019 N. Rose St. Property") doing business as "Franklin Cigarette Depot." Through the discovery it was able to gain, Lorillard learned that defendant Sandra Hazemi had owned the 3019 N. Rose St. Property and transferred it to a Janesville, Wisconsin wholesale supplier named Chambers & Owens in or about June 2003 as part of a settlement in a lawsuit between Chambers & Owens and defendant Montrose Wholesale. During Mrs.

Hazemi's deposition she indicated that she was an "owner" in name only FN4 and that the details concerning the purchase and transfer of the 3019 N. Rose Street Property, among others, were entirely controlled by Ray Hazemi. (*Plaintiff's Emergency Motion to Freeze Assets,* Ex. A, Sandra Hazemi Dep. of 7/26/05 at 359-65). During his deposition on July 21, 2005, Ray Hazemi testified that the Hazemis transferred the 3019 N. Rose Street Property to Chambers & Owens in 2003 and that Chambers & Owens still owned the property on the day of the deposition. (*Plaintiff's Emergency Motion to Freeze Assets,* Ex. B, Ray Hazemi Dep. of 7/21/05 at 94). Mr. Hazemi further testified that he and his wife were attempting to get the property back from Chambers & Owens. (*Id.*).

> FN4. The phrase "in name only" takes on a curious meaning here, as nearly every document associated with the Hazemi's transfer of the 3019 N. Rose St. property identifies the owner as "Sean Semler" or "Sandra Semler Hazemi a/k/a Sean Semler." (*Plaintiff's Emergency Motion to Freeze Assets,* Ex. D; *Declaration of Jeffrey Mote in Support of Emergency Motion to Freeze Assets,* Exs. H at RN 0257; I at 00444; J at 0221, 0229; L; M). Sean Semler is Mrs. Hazemi's brother. At their depositions, neither Mr. nor Mrs. Hazemi could hazard a guess as to why these documents referred to Mrs. Hazemi in this manner.

Ray Hazemi's deposition continued on August 3, 2005. Once again, plaintiff asked whether Chambers & Owens still owned the 3019 N. Rose St. property and Mr. Hazemi states "[t]hat's correct." (*Plaintiff's Emergency Motion to Freeze Assets,* Ex. C, Ray Hazemi Dep. of 8/3/05, at 350). When Mr. Hazemi was asked whether he has had discussions with Chambers & Owens about the return of the 3019 N. Rose St. property, he answered: "[n]o, nothing." (*Id.* at 535). But he added that he and his wife were trying to work out a plan by which the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)

**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

property could be returned to them. (*Id.* at 535-36).

**\*3** The subject of the 3019 N. Rose St. property also came up in court. The parties' counsel appeared before me on July 25 and August 1, 2005, in connection with plaintiff's motion for rule to show cause why Franklin Cigarette Depot should not be held in contempt for failing to respond to a duly served subpoena. (*Plaintiff's Emergency Motion to Freeze Assets,* Exs. D and E, Hearing Transcript Excerpts for the 7/25/05 and 8/1/05 hearings, respectively). These particular hearings concerned the Hazemis' ownership of Franklin Cigarette Depot and the property associated with it located at 3019 N. Rose St. During the July 25, 2005 hearing, the Hazemis' counsel, Robert A. Habib, stated that Ray Hazemi had admitted during his July 21, 2005 deposition that he had an ownership interest in Franklin Cigarette Depot, but that he did not own the real property because it had been turned over to Chambers & Owens. Mr. Habib stated unequivocally that Ray Hazemi testified that the 3019 N. Rose Street Property was no longer owned by the Hazemis, stating "the real estate is gone." (Ex. D at pp. 5-6). Similarly, during the August 1st hearing, Mr. Habib stated that "[t]he property at 3019 North Rose Street they don't own anymore." (Ex. E, pp. 10-11).

As it happens, the Hazemis misrepresented the facts surrounding the Hazemi's ownership of the 3019 N. Rose St. property at their depositions and in open court.FN5 During a Rule 341 Meeting of Creditors (the "341 Meeting") on September 24, 2005, in connection with Montrose's Chapter 11 Bankruptcy case, Chambers & Owens' counsel Scott Shadel informed plaintiffs counsel that Chambers & Owens had transferred the 3019 N. Rose Street Property back to the Hazemis in 2003. Mr. Shadel also indicated he believed from the Hazemis had purchased the property back from Chambers & Owens for about $250,000. On October 21, 2005, Mr. Shadel faxed a copy of the Warranty Deed prepared by Chambers & Owens to transfer the 3019 N. Rose St. property to Sandra Hazemi on September 2, 2003. (*Plaintiff's Emergency Motion to Freeze Assets,* Ex. F).

> FN5. It would also appear that the Hazemi's attorney, Mr. Habib, was victimized by their misrepresentations as well. An able and experienced lawyer, Mr. Habib certainly would not have accepted his client's assertions at face value. Yet, he, too, was taken in by the Hazemis, and employed-unwittingly-in their ruse.

When these serious circumstances came to light by way of Lorillard's emergency motion, I allowed the Hazemis and their attorney a week to file whatever they felt might be an adequate response to being caught in a lie. After what one must assume was a complete and thorough consultation among clients and counsel, Mr. Hazemi offers an explanation by way of a rather sketchy, five-paragraph affidavit.FN6 He states that the transfer of the 3019 N. Rose St. property was made to stop Chambers & Owens from collecting on the judgment from Mr. Hazemi only. When he sold another parcel of property for $250,000, he applied those assets to the judgment as against him. Mr. Hazemi asserts that a Mr. Phil Jackson of Chambers & Owens then "handed [him] a piece of paper and stated that no longer we owe Chambers, but that the debt as to Montrose remained pending." (Reza Hazemi Aff., ¶ 4). The piece of paper, according to Mr. Hazemi, turned out to be the warranty deed, but he swears he did not look at it at the time or know what it was. Instead, he simply put it in his safe, where it languished uninspected until Lorillard filed this motion. (Reza Hazemi Aff. ¶ 4). Similarly, Mrs. Hazemi also swears that she never saw the warranty deed. (Sandra Hazemi Aff.).

> FN6. While Mr. Habib prepared the Hazemis' affidavits in consultation with them, he did not sign the documents. Only the Hazemis have sworn to their veracity.

**\*4** According to Mr. Hazemi, he regarded the mysterious piece of paper as proof that his personal debt to Chambers & Owens had been discharged by

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)

**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

payment of $250,000. (Reza Hazemi Aff., ¶ 4). Having never looked at the document-that is what he claims-it is curious how he can be so sure that it amounted to such proof. As Mr. Hazemi tells the tale, the paper might have been anything at all. Why he was confident that it proved he had paid Chambers & Owen $250,000 is unexplained. Having handed over a quarter-million dollars to satisfy a debt, one might expect even the least sophisticated of businessmen to inspect the note received in return. But Mr. Hazemi is by no means an unsophisticated businessman. He has a masters degree in accounting, and counsel has represented that he has practiced as a CPA in the past. He owns or has owned several businesses with millions of dollars of revenue running through them. The Hazemi's explanation that they were simply unaware that they owned the 3019 N. Rose St. property strains credulity past the breaking point.

The 3019 N. Rose St. property, then, has been in the possession of the Hazemis all along, a hidden asset during this litigation. To ensure that it remained hidden, the Hazemis committed what appears to be perjury at their depositions, then lied to me in an inherently incredible affidavit. Given the history of the Hazemis' conduct in this litigation, and the manner in which they operated their business, however, none of this is surprising. It is just the latest in a long line of underhandedness and deception, as the following discussion will make clear.

**B**
**The Organization and Structure of the Montrose Corporation**
**1**
**The Hazemis' Acquisition of the Corporation**

Shortly after filing suit, Lorillard served Montrose with its first set of interrogatories and document requests, which regarded, in part, Montrose's corporate structure, organization, and financial condition. ((Substitute)Declaration of Jeffrey G. Mote, ("Mote Decl."), Ex. A). In what would become a disheartening pattern for Lorillard, Montrose and the Hazemis initially thwarted Lorillard's discovery efforts. Montrose did, however, produce income tax records for the years 1997 through 2003, which revealed its ownership structure during that period:

1997 Tarek Al-Mikhi (50%); Sandra Semler Hazemi (25%); Jack Shoushtari (25%)

1998 Sandra Semler Hazemi (50%); Jack Shoushtari (50%)

1999 Mr. Hazemi (50%); Jack Shoushtari (50%)

2000 Mr. Hazemi (50%); Jack Shoushtari (50%)

2001 Mr. Hazemi (100%)

2002 Mr. Hazemi (100%)

2003 Mr. Hazemi (50%); Sandra Semler Hazemi (50%)

(Mote Decl., ¶ 7; Ex. I). Finally, on March 8, 2005, after more than a year-and-a-half of awaiting the twice-promised production, Lorillard filed a motion to compel discovery.

At least with respect to the corporate records, the motion did the trick: Montrose produced the documents, however unapologetically, in time to take credit for its "compliance" in its response to Lorillard's motion on April 11, 2005. Significantly, in support of the Montrose defendants' response to Lorillard's motion, Mr. Hazemi's wife, Sandra Semler Hazemi, filed an affidavit in which she swore that she had never been a shareholder, officer or director of Montrose and had never authorized anyone to say she was shareholder, officer or director of Montrose, directly contradicting Montrose's tax returns. (*Def.Resp.,* Ex. 8). The first of many such contradictions.

**\*5** The tardily-produced records reveal that Tarek Al-Mikhi originally formed Montrose on or about March 28, 1997. (Second Declaration of Jeffrey Mote ("2nd Decl."), Ex.DD, Articles of Incorporation and related corporate records, RN 48-82).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)
**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

The company issued 1200 shares to its three share-holders and directors: Tarek Al-Mikhi (President) received 600 shares, Mr. Hazemi (Vice-President) received 300 shares, and Jack Shoushtari (Secretary/Treasurer) received 300 shares. (Ex. DD, at RN 53). On or about February 6, 1998, the Montrose owners entered into an agreement whereby Tarek Al-Mikhi sold all of his shares in Montrose, transferring 300 each to Mr. Hazemi and Jack Shoushtari. (Ex. DD, at RN 6044-6048). Under the transfer agreement, Mr. Al-Mikhi was paid $89,000 at closing and was to receive another $26,250 on the earlier of January 2, 2000, the date Montrose exercised its option to purchase the property housing Montrose at 4417-4425 W. Montrose Avenue in Chicago Illinois, or the date it sold or otherwise transferred this option. (Ex. DD, at 6045). Shortly thereafter, however, the three became entangled in litigation over the transaction. On or about January 2, 2001, Mr. Shoushtari and Mr. Hazemi entered into a "Stock Sales Agreement", whereby Mr. Hazemi immediately acquired 300 shares of Mr. Shoushtari's original Montrose Stock. (Ex. DD, at RN 279-288).[FN7]

> FN7. The "Stock Sales Agreement was a bit out of the ordinary. It called for Mr. Shoushtari to pay Mr. Hazemi $67,952 pursuant to the following significant representation: "Payment of these monies is as a result of the corporation being insolvent at the time of this transaction, that is, its liabilities exceed its assets." (Ex. DD, at RN 279). Mr. Hazemi also agreed to indemnify Mr. Shoushtari against any judgment in a pending lawsuit, *Certified Grocers v. Montrose/Shoushtari,* Case No. 98 L 14808. (Ex. DD, at RN 284). In addition, Shoushtari agreed to transfer any shares received from Mr. Al Mikhi pursuant to those pending lawsuits to Mr. Hazemi for $1. (Ex. DD, at RN 285). The record suggests that he made this transfer on January 2, 2001. (Ex. DD, at RN 277-78).

**2
The Hazemis' Convoluted Acquisition of the Site of Montrose's Operations**

At or near the time Montrose was formed in 1997, it entered into a lease agreement with a Joseph Cholewa, dated March 27, 1997, for the property at 4417-4425 W. Montrose Ave. (Ex. JJ, at RN 84-86). A few days later, on April 3, 1997, Montrose and Mr. Cholewa agreed to a supplemental "Rider" amending the lease agreement by granting, *inter alia,* Montrose an option to buy the property at 4417-4425 W. Montrose for $710,000, to which $7,500 of the $10,500 monthly rent would be credited towards the purchase price of the property. (Ex. JJ, at RN 87-96). In exchange for this purchase option, Montrose paid Mr. Cholewa $60,000, which was to be credited to the eventual purchase price if Montrose exercised its option to purchase. (*Id.*) If Montrose decided not to exercise its option, the "Rider" provided that it was entitled to a "rebate" of two-thirds of the $60,000 option and two-thirds of the $7,500 rent that was to have been allocated towards the purchase price. (*Id.*). Rather than exercising the option outright, Mr. Hazemi and Mr. Shoushtari concocted a scheme whereby they would acquire control of the at 4417-4425 W. Montrose property without appearing to exercise the option, thereby hiding the property as an asset of Montrose and avoiding the need to pay Mr. Al-Mikhi the remaining $26,000 under the stock purchase agreement previously discussed. (Ex. DD, at RN 6045). Once Mr. Cholewa lost his interest in the property sometime between entering into the lease agreement in 1997, and June of 1998, pursuant to a foreclosure proceeding initiated by Parkway Bank & Trust. (Ex. JJ, at GN 187-194), the scheme went into effect.

**\*6** The convoluted process began in June of 1998, when Antonia Shoushtari-Montrose owner Jack Shoushtari's wife-and Bahar Azari-Mr. Hazemi's niece and a then-employee of Montrose-acquired the 4417-4425 W. Montrose property via a Trustee's Deed from Parkway Bank and Trust Company dated June 12, 1998. (Ex. JJ, at SH 65-67). It

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)
**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

would appear from the documents that the two pur-
chased the property for $523,000, taking out a
$418,400 loan from Labe Bank. (Ex. JJ, at SH 57).
They purportedly managed the property under the
name "AB Venture," and the loan was paid off over
an 84-month period.[FN8] Next, Antonia Shoushtari
transferred her entire interest in the property at
4417-4425 W. Montrose property to Bahar Azari
through a quitclaim deed dated January 2, 2001. The
transfer between Antonia and Bahar was made
for *no* consideration. (Ex. JJ, at GN 184-186). On
February 20, 2003, Bahar Azari transferred her en-
tire interest in the 4417-4425 W. Montrose property
for *no* consideration via a quitclaim deed to a com-
pany called 6201 S. Champlain LLC, which was
formed by Mike Kakvand, who will be discussed
later. Interestingly, the company listed 4417 W.
Montrose, the location of the Montrose store, as its
address. (Ex. JJ, at GN 36-38). The very next day,
on February 21, 2003, Mr. Kakvand's company ex-
ecuted a resolution purporting to authorize the
transfer of the 4417-4425 W. Montrose property
(Ex. JJ. at GN 138), and transferred the property to
Sandra Hazemi via a warranty deed. (Ex. JJ, at GN
28-35).

> FN8. Lorillard submits that rental income
> from tenants of the property at 4417-4425
> W. Montrose would not come close to
> making this expedited payment schedule.
> Instead, it would appear that AB Venture
> was dependent on cash funneled from
> Montrose to cover the balance of each
> monthly payment. Although Montrose and
> the property owners represented that Mon-
> trose's rent was $3,500 per month, it was
> actually paying $6,000 per month by check
> to Mrs. Shoushtari and Ms. Azari. (Ex.
> SS). It would seem that utility bills for the
> property were directed to Montrose and its
> owners and paid with Montrose's funds.
> (Ex. SS). Montrose paid for the electrical
> utilities and property insurance directly, al-
> though all these expenses were identified
> as being paid by the nominal owners of the

property. (*Id.*).

**3**
**Montrose's Shakey Corporate Standing**
Despite the Montrose defendants' recalcitrance
throughout discovery, Lorillard has been able to un-
cover some information regarding Montrose's cor-
porate status, which suggests that Montrose has had
some difficulty with the Secretary of State for the
State of Illinois. The State of Illinois administrat-
ively dissolved Montrose on August 1, 1998. On
August 10, 2000, Montrose submitted a change of
registered agent (changing from Ganders P. Capon-
ize to its counsel in this suit, Robert Egan) to the
Illinois Secretary of State as well as an Application
for Reinstatement signed by Jack Shoushtari as
Montrose' Secretary and Sandra Hazemi as Mon-
trose Vice President. (Ex. DD, at RN 97-101). Mrs.
Hazemi's signature in that capacity is rather curi-
ous, given the fact that she has sworn that she has
never been an officer or director with Montrose. (
*Def.Resp.,* Ex. E).

In any event, the State issued a formal Certific-
ate of Reinstatement on August 10, 2000. (Ex. DD,
at RN 100). The State administratively dissolved
Montrose again a year later on August 1, 2001, and
subsequently reinstated it on March 18, 2002. (Ex.
DD, at RN 114-116). Continuing the pattern, Mon-
trose was administratively dissolved on August 1,
2003, for failure to file its annual report and pay its
annual franchise tax, but was subsequently rein-
stated on October 3, 2003. (Ex. DD, at RN
117-120). The Montrose defendants claim that
Montrose closed its operations as of October 31,
2003 (*Def.Resp.,* at 2, 8), but, as of February 19,
2005, the Illinois Secretary of State's Real Time
Corporate/LLC database identified Montrose's
status as "Goodstanding." (Ex. K). In the interim,
according to Mr. Mote's Second Declaration, Sean
Semler, Sandra Hazemi's brother, incorporated
Montrose Wholesale Food Co. at Mr. Hazemi's re-
quest; it was administratively dissolved on Novem-
ber 1, 2004. (2nd Decl., ¶ 37; Ex. FF). As of May
12, 2005, the database listed Montrose as "Not

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)
**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

Good Standing." (Ex. FF).

**\*7** It is telling, that the Montrose defendants never produced any records relating to these changes in the corporation's status. Moreover, the Montrose defendants have never disclosed that Montrose is no longer operating in any of their discovery responses; not in Montrose's original October 15, 2003, initial disclosures (Ex. T), or in the Montrose defendants' initial disclosures from on March 1, 2005 (Ex. U). Timely disclosure of this information would have been required under Fed.R.Civ.P. 26(e). Purchase records that Lorillard has obtained through third parties indicate that Montrose continued doing business at least through September of 2004. (2nd Mote Decl., Ex. HH). Similarly, Montrose answered Lorillard's Second Amended Complaint in February 2005, long after it purportedly stopped doing business. That the corporation seems to be an apparition, appearing from time to time, may be no accident, and it is certainly in keeping with the manner in which its financial records were, and are, "kept."

**C**
**The Hazemis' Questionable Business Practices**
**1**
**Cigarette Purchases**

After a long and fruitless pursuit of Montrose's financial records and accounting information, Lorillard appears to be resigned to the fate that business records one might ordinarily expect to exist in an operation with the sales of Montrose simply do not. (*Plaintiff's Reply,* at 9-11). Among these would appear to be records of cigarette purchases. Initially, in its August 2003 responses, Montrose promised to make 10 to 12 boxes of cigarette purchase invoices available for inspection. (Mote Decl., Ex A2, Resp. 3). Montrose's counsel also wrote Lorillard's counsel a letter dated July 25, 2003, indicating the same thing. (*Def.Resp.;* Ex. 3). But Lorillard was still seeking these records at the time of Mr. Hazemi's first deposition on February 2, 2004. (Mote Decl., Ex. C, at 160). That day, Mr. Hazemi explained that records of his purchases were loosely kept in 5 or 6

boxes at the Montrose facility, and Montrose's counsel again stated that Lorillard could inspect the documents. (Mote Decl., Ex. C, at 160-62). Nevertheless, Lorillard had to request these records again when it served discovery requests on Mr. Hazemi. At that time Mr. Hazemi declared that Montrose had already produced them. (Mote Decl., Ex. B1, Resp. 2, 4). By the time of his second deposition, however, he was not as certain.

At Mr. Hazemi's second deposition on December 14, 2004, the topic of these boxes, be there 5 or 6, or 10 or 12, came up once again.

Q: Now, where are these 10 to 12 boxes maintained?

A: I will try to tell you guys. I think you guys took it. You guys say no, but I think you guys took it.

Q: ... [L]ong after the date of the seizure, [you said] you had 10 to 12 boxes ... and you would make them available to us to come to inspect.

I'm asking you, where are those 10 to 12 boxes of documents presently stored?

A: I don't know. I don't know.

\* \* \*

**\*8** Q: So is it possible that you've destroyed or discarded the 10 to 12 boxes?

A: Not whatsoever.

\* \* \*

A: They're someplace in my basement or someplace. I have to find them.

\* \* \*

Q: Is it possible that they might still be at Montrose Wholesale?

A: No.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)
**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

Q: ... Is there a place other than your house where they might have been taken?

A: No. I take everything to my house.

(Mote Decl., Ex. D, at 231-33).

Later in his deposition, Mr. Hazemi added further confusion to the question of the whereabouts of the cigarette purchase invoices. He testified that when Montrose purchased Newport cigarettes from distributors, he "dumped" the invoices in a cabinet. (Mote Decl., Ex. D, at 209). He did not maintain these purchase invoices, however, but discarded them. (Ex. D, at 210). Shockingly, he testified that he did this even after Lorillard filed suit, seemingly admitting to spoliation of evidence. (Ex. D, at 210). According to Mr. Hazemi, he did not feel the need to keep such records because MSA [FN9] kept track of these things. (Ex. D, at 210-11).

> **FN9.** According to Lorillard's counsel, the last part of the cigarette distribution chain involves the sale of tobacco products from retailers who are authorized to participate in certain cigarette promotional programs to consumers. Typically, these promotions involve rebate payments-known in the industry as "buydown" programs-wherein an authorized retail distributor is paid a rebate for each carton it sells during the term of the "buydown" program, provided the retailer purchased such carton from an authorized wholesale distributor. Authorized wholesale distributors agree to report all purchases and sales of a particular manufacturer's promotional cigarette products to Management Science Associates, a consultant the tobacco companies employ to collect data on sales and distribution of their products. UPC scanning is a part of this sophisticated and far-reaching information gathering system *See* http://www.msa.com; *Holiday Wholesale Grocery Co. v. Philip Morris Inc.,* 231 F.Supp.2d 1253, 1291 (N.D.Ga.2002). To-

bacco manufacturers, including Lorillard, use the data reported to MSA to monitor and detect potential fraudulent reporting by wholesale distributors and their retail customers who are participating in the manufacturer's promotional programs.

Along similar lines, Mr. Hazemi described his bookkeeping:

> There's no accounting book. It's very, very simple. Either money comes or money goes. Money goes to the bank. Money comes and then turns around and goes to the bank. Then you purchase. There is no accounting. There is no booking.

(Ex. D, at 188, 194). Mr. Hazemi did allow, however, that he could contact the suppliers that sold him Newport cigarettes-Costco and City Sales-for copies of Montrose's purchase invoices. (Ex. D, at 209-10, 212). He later admitted that he also bought Newport cigarettes from other suppliers as well: McClain, Chambers & Owen, and Flemming. (Ex. D, at 229). Lorillard's counsel specifically asked him about one more distributor, Peter Karfias, and Mr. Hazemi testified that Montrose purchased only "fourth tier" cigarettes from him, never Newports. (Ex. D, at 91-93). In fact, invoices from Mr. Karfias indicate that Montrose had actually purchased more than $60,000 worth of Newport cigarettes from him between August 12, 2003, and November 18, 2004. (2nd Decl., Ex. QQ).

Mr. Hazemi testified that he paid for these cigarettes by check on Montrose's account at Labe Bank, and kept the cancelled checks in a drawer. (Ex. D, at 213). He thought Lorillard had obtained these in the seizure. (Ex. D, at 213). On other occasions, Mubeen Hussain purchased cigarettes for Montrose and paid for them with his personal credit card; Mr. Hazemi would reimburse him with cash. (Ex. D, at 214). Mr. Hazemi testified that he had no receipts for these purchases. (Ex. D, at 216).

In the time since Mr. Hazemi's second depos-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 10

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)
**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

ition, the Montrose defendants have decided that he does not take everything to his house or discard invoices after "dumping them in a cabinet. In its response to Lorillard's previous motion, Montrose and the Hazemis maintain the Lorillard obtained the boxes of documents at the seizure. (*Def.Resp.,* at 3). Unfortunately for the Montrose defendants, the seizure occurred on July 16, 2003. Some two weeks later, on August 1, 2003, Montrose offered to produce the 10 to 12 boxes of invoices in response to Lorillard's discovery requests. (Ex. A2, Resp.3). This, despite the fact that the offer to allow the boxes to be inspected came after the cigarette and document seizure occurred on July 16, 2003. In addition, in a letter dated April 18, 2005, Montrose's counsel informed Lorillard that he had three boxes of Montrose documents including "bank statements, delivery sheets, orders, purchase invoices, and other business documents." (Second Declaration of Jeffrey Mote ("2nd Mote Decl."), Ex. BB). Montrose's purchase orders and invoices, then, seem to be a target forever in motion, if they exist at all.

## 2
### Cigarette Sales

**\*9** Lorillard also sought sales records that purportedly existed on Montrose's computer's hard drive which it used for cigarette sales reporting. (*Combined Motion and Memorandum to Compel Discovery and Freeze Assets* (" *Pl.Mem.* "), at 3). This was necessary in order to explain PDF images on a compact disc that Montrose had produced as evidence of cigarette sales it reported to MSA in 2003. (2nd Mote Decl., ¶ 30). After repeated requests for the hard drive went unfulfilled, Lorillard subpoenaed a backup file of Montrose's computer records from Montrose's computer consultant, Osama Mouhsen, on January 12, 2005. (*Pl.Mem.,* at 3). Mr. Mouhsen had two overlapping data bases from Montrose, one covering November of 2003 through February of 2005, and one covering December of 2001 to March of 2004. (2nd Decl., Ex. II, at 78-79). At his deposition on March 21, 2005, Mr. Mouhsen explained that Mr. Hazemi had asked him to switch data bases in March of 2004,

and to create a new one that covered the period beginning in November of 2003. (Ex. II, at 78-79). He also indicated that he offered to sell Mr. Hazemi a scanning device and program for incoming inventory, but Mr. Hazemi was not interested. (Ex. II, at 80). Mr. Hazemi did, at least, use a UPC scanner dedicated to the sales of cigarettes. (Mote Decl., Ex. D, at 202-04). Once Montrose became aware of the subpoena, it agreed to produce the hard drive for inspection, and Lorillard engaged a forensics firm to image it. (*Pl.Mem.,* at 3). All this to secure discovery of sales records that one would ordinarily expect to be much easier to obtain.

According to Mr. Hazemi, he did not bother to track inventory at Montrose, he would simply looked at the shelves and take a rough guess. (Mote Decl., Ex. D, at 205-06). At any given time, Mr. Hazemi said, there were 6000 cartons of cigarettes at Montrose, 15 to 20% of which were Newport cigarettes. (Mote Decl., Ex. D, at 206). After the seizure, Mr. Hazemi said that figure was closer to 3 to 5%. (Mote Decl., Ex. D, at 207). Mr. Hazemi testified that those inventory levels would also reflect the percentages of Newport sales. (Mote Decl., Ex. D, at 207). For a more specific answer, Mr. Hazemi referred Lorillard's counsel to MSA. (Mote Decl., Ex. D, at 207-08).

## 3
### Other Discovery Efforts

Given the paucity of Montrose's records, Lorillard consulted the MSA records as Mr. Hazemi had repeatedly encouraged it to do. Those records for the year 2003 detailing inbound and outbound shipments reveal Montrose had sales of promotional Newport cigarettes that far exceed its purchases. (Ex. O). This information is certainly suspicious and, as Lorillard points out, seems to suggest that Montrose was acquiring significant volumes of Newport cigarettes from illegitimate, non-reporting sources and/or providing its retail customers with fraudulent invoices to obtain higher rebate payments from Lorillard.

Montrose still refuses to produce financial or

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)
**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

accounting records, even for the very recent past, claiming that it does not keep even the most basic records, such as balance sheets, income statements, or cash flow statements. (*Pl.Mem.,* at 3-4). According to the Montrose defendants, this is because the Hazemis work long hours and have little time for paperwork, relying instead on deposits and expenditures for income and expenses. (*Def.Resp.,* at 1). Nevertheless, it is strange-to say the least-that Mr. Hazemi, who has a masters degree in accounting from Roosevelt University (Mote Decl., Ex C. at 30), would cavalierly eschew even the simplest of business practices. Strange, unless there turns out to be an underhanded explanation for it.

**D**
**Creative Tax Returns**

**\*10** At his first deposition in February 2004, Mr. Hazemi testified that he had not filed a return for Montrose or himself since 1999. (Ex. C, at 133-34). He explained that he had asked for extensions every year. (Ex. C, at 134). The returns produced, then, were apparently merely drafts. On February 22, 2005, Montrose made a supplemental production of purported income tax returns for the years 1997 through1999. The 1997 return is the only one signed by an officer of Montrose; again, it would appear that the others were never filed. (Exs.I1-I7). Once again, Lorillard was left to its own devices to assemble some kind of picture of Montrose's finances.

Lorillard deposed Montrose's tax preparer, John Cherachi, on February 2, 2005. According to Mr. Cherachi, the Montrose returns for the years 2000-2003 were "draft" tax returns that had not been filed. (Ex. G, at 195, 199-200, 231). Mr. Cherachi also produced income tax return records for the Hazemis for the years 2000, 2002, and 2003 (the 2001 return was missing). (Exs.H1-H4). He prepared returns for the years 2001 through 2003 all at the same time, in May or June of 2004. (Ex. G. at 149-50). Mr. Cherachi testified that he had prepared tax returns for the Hazemis since the early 1990s, but could not recall a single instance in

which the Hazemis had not required an extension from the IRS because their records were always incomplete. (Ex. G, at 231-35). And he did not know if the Hazemis had ever actually filed these returns. (Ex. G, at 151).

During his deposition, Mr. Cherachi testified that he met with Mr. Hazemi in approximately June of 2004, and prepared summary spreadsheets (Ex. J) for Montrose's 2001-2003 income tax returns. (Ex. G, at 154-55). At that time, however, Mr. Hazemi did not provide Mr. Cherachi with any financial records or documents to prepare these spreadsheets. Instead, he sat next to him at a computer in his home and orally told him, reading from notes, what numbers to insert in the spreadsheets. (Ex. G, at 150-154). Tellingly, Mr. Cherachi testified that Mr. Hazemi requested he prepare Montrose's 2003 return as a "final" return and that he zero out the books for Montrose Wholesale on the balance sheets included in that return. (Ex. G, at 179; Ex. I7). This, as already noted, directly conflicts with evidence elsewhere in the record.

At various times since at least January 2, 2001, Montrose's principals have represented to others that Montrose was insolvent, beginning with, as already noted, the Stock Purchase Agreement. (Ex. DD, at RN 279). In February 2002, the Montrose defendants' counsel in this lawsuit, Robert Egan, represented to plaintiff's counsel in another lawsuit involving a supplier, Chambers & Owens, that both Montrose and Ray Hazemi were financially insolvent. (Ex. GG). Montrose's income tax returns from 1997 through 2003, show purported losses of more than $2,889,350 during that period. (Exs.I1-I7). Nearly all of those losses-$2,771,756-were reported after the Hazemis took full control of Montrose. Mr. Cherachi confirmed that the losses reported in Montrose's 2001-2003 tax returns were based on numbers Mr. Hazemi dictated to him as he sat at his computer; he never saw any corroborating financial records. (See Exs. I5-I7; Ex. G at 150-157). That is certainly not surprising, given Mr. Hazemi's "bookkeeping" or lack thereof.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)
**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

E
**The Hazemis' Banking Records and Use of Corporate Funds**

**\*11** Throughout this litigation, bank records-even the mere existence of accounts-have, like records of every other type, been a matter of some secrecy for the Hazemis and the Montrose corporation. At his second deposition, Mr. Hazemi testified that Montrose maintained its only bank account-a checking account-at Labe Bank. (Mote Decl., Ex. D, at 188, 194). He also stated that he had no personal bank account of any kind. (Mote Decl., Ex. D, at 188, 190). His wife, however, maintained an account with Citibank. (Mote Decl., Ex. D, at 189). Although Mr. Hazemi testified that the funding for that account comes from Montrose (Mote Decl., Ex. D, at 192), his wife swore in her affidavit that she has never received any money from Montrose. (*Def.Resp.,* Ex. 8). As for his lack of any type of banking or checking account, Mr. Hazemi explained that he simply paid cash to cover his day-to-day expenses, using money from Montrose.[FN10] (Mote Decl., Ex. D, at 190). The Hazemis used Sandra Hazemi's account to pay the mortgage, the utilities, grocery bills, and clothing expenses. (Mote Decl., Ex. D, at 191).

> FN10. According to the Montrose defendants, Mr. Hazemi accounts for this by declaring a "management fee" from Montrose, which is reflected in his personal tax returns. (*Def.Resp.,* at 4). As already noted, however, these returns have never been filed, and were based on figures Mr. Hazemi dictated to Mr. Cherachi which may or may not have been drawn from an actual financial record. Given Mr. Hazemi's admitted aversion to bookkeeping, it is more likely they were not.

When Montrose refused to voluntarily produce its bank records, Lorillard began to subpoena its banks including Labe Federal Bank and Village Bank and Trust. Records from Labe Federal Bank reveal that between February 2, 2002 and June 13, 2003, Mr. Hazemi wrote more than $8,779,000 in checks to "Montrose Wholesale," purportedly for cash drawn on Montrose's Labe Bank account. (Ex. L). Montrose has not produced any records identifying where these funds were transferred or how the funds were used. In their response to Lorillard's motion, the Montrose defendants explain these funds were deposited at Parkway Bank & Trust in what they call an "ancillary" account and used to purchase cigarettes from a distributor called Fleming. (*Def.Resp.,* at 5, 10). Incredibly, the Montrose defendants fault Lorillard for "distort[ing] the use of the account by ... not demonstrating any disbursements from the account." (*Id.*). It is the Montrose defendants, however, who have produced no records relating to this account; any distortion of their activities is a product of their non-compliance with discovery.

Lorillard also obtained bank records for another undisclosed account. It seems Montrose held an account at Village Bank & Trust from November 2002 until the end of July 2004, despite the fact that Mr. Hazemi testified that Montrose did all its banking at Labe Bank. (Ex. M). These records reveal more than a million dollars in transactions during that period. Thus, approximately ten million dollars ran through these two accounts that apparently slipped Mr. Hazemi's mind at his second deposition. To date, Lorillard continues to seek records relating to these accounts, including cancelled checks, without success.

Village Bank & Trust was also a source of three loans to Montrose and the Hazemis. (Exs.Nl-N3). Neither the Hazemis nor Montrose have produced records relating to these transactions. The first loan is a credit account for $85,000, for the Hazemis dated November 27, 2002, with a mortgage taken on the Hazemi's home at 650 Pleasant Lane, Lombard, Illinois. (Ex. N1). The second loan involves a $750,000 Promissory Note dated February 21, 2003. The loan agreement is referred to as a "Business Loan Agreement" and identifies Sandra Hazemi as the borrower of purchase money

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)
**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

for the property located on three lots at 4417 W. Montrose Avenue, in Chicago-the property that houses Montrose. Interestingly, Mr. Hazemi is listed as an unlimited guarantor on the loan, despite the fact that, at his second deposition, he claimed that he had no assets, aside from being the sole shareholder in Montrose. (Ex. D, at 193). He also claimed neither he nor his wife owned any property except for the family home in Lombard, Illinois, and an interest in her family's home in Canada. (Ex. D, at 197).

**\*12** The third loan is dated April 8, 2003 and involves a Promissory Note for $350,000 to Montrose and First National Bank of Blue Island, Trust No. 71013 as joint borrowers. (Ex. N3). Montrose has never produced nor otherwise disclosed any interests it has in property with this trust. Moreover, the address provided for First National Bank of Blue Island, Trust No. 71013, is 6630 W. Montrose Avenue-the same address as that linked to numerous businesses affiliated with the Hazemis and their relatives. Trust documents attached to the loan papers reveal that Ray Hazemi and his sister, Giti Azari, were assigned the beneficial rights in the trust on April 3, 2003, and that the trust was set up in connection with a 1999 installment contract for property that Giti Azari purchased. (Ex. N, at VBT 000117).

### F

### Associated Businesses

Mr. Hazemi has been similarly cryptic regarding the other businesses with which he has been, and is, affiliated. When Lorillard posed an interrogatory asking him to identity "each and every business" that he had ever been "affiliated with as an owner, shareholder, employee, officer or agent," Mr. Hazemi certified that the only businesses he has been affiliated with are Montrose Wholesale and G & D Pantry, as their respective presidents. (Ex. B2, ¶ 8). Lorillard's investigations have suggested otherwise. At his deposition, Mr. Cherachi testified that Mr. Hazemi had hired him to prepare taxes for at least three other business, S & D

Pantry, Franklin Cigarette Depot, and Malibu, Inc. (Ex.G, at 59, 62-63, 67-68). In addition, other evidence Lorillard obtained pursuant to third-party subpoenas confirmed that Mr. Hazemi neglected to mention several businesses with which he had been affiliated in one capacity or another: Harwood Heights Gas Mart (employee); S & D Pantry (employee); Malibu Inc. (president and owner); Franklin Cigarette Depot (owner and employee); and Milano Pizza (owner or manager). (Ex. CC).

Mrs. Hazemi also has certain property interests that Mr. Hazemi chose to keep secret as his deposition: 4417-4425 W. Montrose Avenue, Chicago; 6764 W. Forest Preserve Drive, Harwood Heights (Ex. N); and, of course, the aforementioned 3019 N. Rose Street property. (*Plaintiff's Emergency Motion to Freeze Assets,* Ex. F). This contradicts not only the Hazemi's recent testimony at their depositions in July and August of 2005, but even Mr. Hazemi's earlier testimony that his wife had no real property interests aside from the Hazemi's house in Lombard and a house in Canada that had been in the family for sixty years. (Ex. D at 196-197). And of course, it demonstrates that the Hazemis have no qualms about flirting with perjury to see to it that their assets remain hidden.

As is apparent from the forgoing, and from the Hazemis' efforts to secure the property where the Montrose store is located, Mr. Kakvand has a good deal of involvement with the Hazemis and their businesses. In October of 2004, he was indicted along with Ali Razvi in the Northern District of Illinois, for bank and wire fraud in connection with a scheme to defraud mortgage lenders out of more than $27 million. (Ex. KK, Case No. 04 CR 0896). According to the indictment, Kakvand would purchase run-down apartment buildings through companies he either owned or controlled-including Residential Realty Development, Inc., Infiniti Financial Corporation, Liberty Financial, and Mortgage Bankers Service Corporation-and obtain false, inflated appraisals from co-conspirators based on non-existent renovations. (Ex. KK, Case No. 04 CR

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)
**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

0896). He would then resell the properties as condo developments or apartments to shill buyers for whom he obtained and then pocketed mortgage loans. (Ex. KK, Case No. 04 CR 0896). One of the fraudulent apartment transactions identified in the indictment involves the aforementioned property at 6201-6203 S. Champlain Avenue and Mr. Kakvand's company, 6201 S. Champlain, LLC. (Ex. KK, at 4). The address for the company is the same as Montrose's address, 4419 W. Montrose Avenue. (Ex. MM).

**\*13** Interestingly, Mr. Kakvand purchased the Champlain property from Omni Investments, LLC, which is run by Bardan Azari, son of Giti Azari. (Ex. MM). Giti Azari was also the registered agent for the previously mentioned Kakvand company, Liberty Financial. (Ex. MM). Bardan and Bahar Azari also are linked to Liberty Financial as evidenced by the Citations to Discover Assets served on them in connection with a civil case against Kakvand, *Hoge v. Kakvand,* Cook County Case No. 95 CH 10195. (Ex. MM). Giti Azari and Bahar Azari also both worked at another of Mr. Kakvand's businesses, Mortgage Bankers Service Corporation, in 1999 through 2001, which received at least a few administrative penalties from the Illinois Office of Banks and Real Estate ("OBRE"), including a license revocation. (Ex. LL). The company also figures in several loans to Sandra Hazemi and the Azaris. (Ex. NN).

Through Illinois property records, Lorillard discovered that Bahar Azari used her connections at Mortgage Bankers Service Corporation to obtain loans to acquire properties at 5504 W Agatite Avenue and 5806 W Giddings Street in Chicago. In addition, Giti Azari approved a series of loans to Sandra Hazemi from Mortgage Bankers Service Corporation. (Ex. NN). Sandra Hazemi obtained at least two loans from that firm for her home at 650 Pleasant Lane in Lombard, Illinois. (Ex. NN). Sandra Hazemi also acquired the property at 6774 W. Forest Preserve Drive, Chicago, in 1999 from Mr. Kakvand and Residential Realty Development

with a $450,000 loan from Labe Bank. (Ex. OO, loan no. 01-12000452). Closing records show that $390,796.56 was distributed to Mr. Kavand's Residential Realty Development, Inc. (Ex. OO, at LAB 2095). Interestingly, Giti Azari signed on behalf of MBBG, Inc. as guarantor on the Labe Bank note for Sandra Hazemi's purchase of 6774 W. Forest Preserve Drive. (Ex. OO, at LAB 2115).

## II
## THE PROPRIETY OF FREEZING ASSETS IN THIS CASE

Based on the foregoing record, Lorillard asks this court to enter an order freezing the assets of Montrose and the Hazemis under *Fed.R .Civ.P. 65*. A district court is not permitted to freeze a defendant's assets solely to preserve a plaintiff's right to recover damages. *Grupo Mexicano de Desarollo, S.A. v. Aliance Bond Fund,* 527 U.S. 308 (1999). The decision in *Grupo Mexicano,* however, did not concern the preliminary relief available in a suit seeking an equitable remedy. 527 U.S. at 325. Indeed, the Supreme Court made note of the fact that a restraint on assets was still available when the suit sought an equitable relief. *Id.* at 325 (citing *Deckert v. Independence Shares Corp.,* 311 U.S. 282 (1940) (upholding prejudgment asset freeze in case seeking equitable relief, including appointment of receiver to wind up corporation, rescission of contracts, and the return of disputed fund of money)). In this instance, Lorillard seeks, among other relief contemplated by the Lanham Act, a disgorgement of the Montrose defendants' profits, which is an equitable remedy. *CSC Holdings, Inc. v. Redisi,* 309 F.3d 988, 996 (7th Cir.2002); *BASF Corp.,* 41 F.3d at 1095-96.[FN11] Because Lorillard seeks to recover the Montrose defendants' profits, then, an order freezing the Montrose defendants' assets is within the court's authority. In, *CSC Holdings,* for example, the court found that an asset freeze was entirely proper where the plaintiff sought remedies that including accounting and profits. As such, the court has the authority to enter an order freezing assets in cases where the plaintiff seeks an equitable remedy generally, *CSC Holdings,* 309 F.3d at 996;

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)
**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

*S.E .C. v. ETS Payphones, Inc.,* 408 F.3d 727, 734 (11th Cir.2005); *Elliott v. Kiesewetter,* 98 F.3d 47, 58 (3rd Cir.1996),* and specifically, in Lanham Act cases such as this one. *Levi Strauss & Co. v. Sunrise Intern. Trading Inc.,* 51 F.3d 982, 987 (11th Cir.1995); *Reebok International, Ltd. v. Marnatech Enterprises,* 970 F.2d 552, 559 (9th Cir.1992). After a review of the voluminous record in this case, the court finds that a preliminary injunction freezing the Montrose defendants' assets is warranted in this case.[FN12]

>   FN11. The Montrose defendants argue that Lorillard must establish a nexus between the sale of counterfeit cigarettes-specifically, five cartons that apparently have been seized-and the assets to be frozen. (*Def.Resp.,* at 13-14). In support, they rely on two cases: *Mitsubishi International v. Cardinal Textile Sales,* 14 F.3d 1507 (11th Cir.1994); and *Rosen v. Cascade International, Inc.,* 21 F.3d 1520 (11th Cir.1994). Neither case supports the Montrose defendants' position. In *Mitsubishi,* while the Ninth Circuit did hold that "a court may not reach a defendant's assets unrelated to the underlying litigation and freeze them so that they may be preserved to satisfy a potential money judgment," 14 F.3d at 1521, it had no occasion to consider the propriety of freezing assets to preserve a party's right to an equitable remedy. Instead, the relief at issue was the payment of a debt and money damages for fraud. The *Rosen* court held similarly, but took care to distinguish situations in which the plaintiff is seeking only an award of monetary damages from those in which the plaintiff is seeking equitable relief. 21 F.3d at 1527, 1528-29. That distinction, at work here, is apparently lost on the Montrose defendants. Furthermore, to the extent that the Montrose defendants argue that the individual Hazemis' assets are out of reach, such concerns are addressed in the court's

discussion of Lorillard's "alter ego" theory.

>   FN12. The Montrose defendants submit, without authority, that a preliminary injunction cannot be entered without a hearing. (*Def.Resp.,* at 12). Rule 65, however, does not make a hearing a prerequisite for ruling on a preliminary injunction. Certainly, if genuine issues of material fact are created by the response to a motion for a preliminary injunction, an evidentiary hearing is indeed required. *Ty, Inc. v. GMA Accessories, Inc.,* 132 F.3d 1167, 1171 (7th Cir.1997). "But as in any case in which a party seeks an evidentiary hearing, he must be able to persuade the court that the issue is indeed genuine and material and so a hearing would be productive-he must show in other words that he has and intends to introduce evidence that if believed will so weaken the moving party's case as to affect the judge's decision on whether to issue an injunction." *Id.* Here, the Montrose defendants have made no such showing and, indeed, do not even expound upon their assertion that the court must conduct a hearing. They do not indicate what evidence they might introduce against Lorillard's motion and, given that they admit that they keep virtually no corporate or financial records, it is doubtful that any such evidence exists. *See In re Aimster Copyright Litigation,* 334 F.3d 643, 654 (7th Cir.2003) (party's own activity hampered its ability to present contrary evidence in preliminary injunction proceeding). As the court has already detailed, the record assembled in this matter is extensive. It includes two depositions' worth of Mr. Hazemi's sworn testimony, not to mention a sworn affidavit from his wife. Add these to more than a thousand pages of financial and business records and the material before the court is more than adequate to allow the court to rule on Loril-

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)
**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

lard's motion without a hearing.

**\*14** A party seeking a preliminary injunction under Fed.R.Civ.P. 65 is required to demonstrate a likelihood of success on the merits, that it has no adequate remedy at law, and that it will suffer irreparable harm if the relief is not granted. *Promatek Industries, Ltd. v. Equitrac Corp.,* 300 F.3d 808, 811 (7th Cir.2002). If the moving party can satisfy these conditions, the court must then consider any irreparable harm an injunction would cause the nonmoving party. *Promatek Industries,* 300 F.3d at 811. Finally, sitting as a court of equity, the court then weighs all these factors employing a sliding-scale approach: the more likely the plaintiff's chance of success on the merits, the less the balance of harms need weigh in its favor. *Promatek Industries,* 300 F.3d at 811.

**A**

**Likelihood of Success on the Merits**

In the context of a motion for a preliminary injunction in a trademark infringement claim, a likelihood of success exists if the party seeking the preliminary injunctive relief demonstrates that it has a "better than negligible" chance of succeeding on the merits of the underlying infringement claim. *Platinum Home Mortg. Corp. v. Platinum Financial Group, Inc.,* 149 F.3d 722, 726 (7th Cir.1998). The record thus far assembled in this matter certainly meets this rather minimal hurdle. Indeed, on July 15, 2003, Judge Aspen entered an ex parte seizure order in which he found that Lorillard was likely to succeed on the merits in this case. Nothing has occurred since Judge Aspen made that finding that would convince the court to disturb his ruling. At that time, one of Lorillard's division managers had purchased cigarettes that had turned out to be counterfeit at the Montrose store. The seizure produced further evidence of counterfeit cigarettes. MSA records reveal Montrose had sales of promotional Newport cigarettes that far exceed its purchases, arguably suggesting that Montrose was acquiring significant volumes of Newport cigarettes from illegitimate, non-reporting sources and/or providing its

retail customers with fraudulent invoices to obtain higher rebate payments from Lorillard. In addition, at his deposition, Mr. Hazemi was less than frank about his sources of Newport cigarettes. The record satisfies the court that Lorillard has "better than negligible" chase of succeeding on the merits of its case.

For the court's purposes here, however, the likelihood of Lorillard's success in pursuing their "alter ego" theory of liability against the Hazemis is just as important as their likelihood of success on their Lanham Act claims. Under Illinois law, to succeed on this theory, Lorillard must show that: "(1) there is such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) circumstances are such that adhering to the fiction of a separate corporate existence would promote injustice or inequity." *International Financial Services Corp. v. Chromas Technologies Canada, Inc.,* 356 F.3d 731, 736 (7th Cir.2004). Among the factors pertinent to this showing are whether there was inadequate capitalization, a failure to observe corporate formalities, an absence of corporate records, and commingling of funds. 356 F.3d at 738. Once again, the record as it stands in this case is more than adequate to demonstrate that Lorillard is likely to succeed on its "alter ego" theory.

**\*15** Corporate formalities such as meetings or corporate minutes are not a part of the Montrose defendants' operations. Courts are known to allow sole proprietors or husband-and-wife proprietors some leeway in this area, especially where they have made efforts to maintain records and keep corporate funds separate from their own. *See, e.g., Trustees of Pension, Welfare and Vacation Fringe Ben. Funds of IBEW Local 701 v. Favia Elec. Co., Inc.,* 995 F.2d 785, 788 (7th Cir.1993). Here, however, the Hazemis admittedly have made no such efforts. In addition, they are less than forthcoming about Montrose's corporate ownership structure. While Mrs. Hazemi was listed as a 50% owner in 1998, she was apparently replaced in this

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)
**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

position by her husband in 1999. She was a 50% owner once again in 2003, apparently taking over half of her husband's share at that time. What is a bit more disturbing, however, is that Mrs. Hazemi has filed an affidavit in which she swears she has never been a shareholder of Montrose. (*Def.Resp.,* Ex. 8). She also swore that she has never been an officer of Montrose, yet she signed an application for the corporation's reinstatement as vice president. This obfuscation about the Hazemi's shareholder status might not be a terribly significant factor when viewed in isolation, but in this case, it must be combined with the following evidence regarding the absence of any corporate record keeping and the Hazemi's commingling of Montrose's funds with their own.

Finding an absence of corporate records can be no easier than it is in this case: the Montrose defendants trumpet their failure to keep corporate records, employing it as a shield against discovery. According to them, there are no records such as balance sheets, cash flow statements, or accounting ledgers, for Montrose. (Mote Decl., Ex. D, at 188, 194, 210-11; *Def.Resp.* at 8). The Montrose defendants claim they do not keep order forms or track inventory. (Ex. D, at 205-06; *Def.Resp.,* at 9). Instead, Montrose's sole records are cancelled checks and bank deposits. (Ex. D, at 188, 194; *Def.Resp.,* at 8). Everything, the Montrose defendants claim, is based on cancelled checks and bank deposits, including tax returns. (*Def.Resp.,* at 10). Those tax returns are prepared by Mr. Hazemi dictating numbers to Mr. Cherachi without any corroborating financial records. (Mote Decl., Ex. G, at 150-54). The last time either Montrose or Mr. Hazemi filed a tax return was 1999. (Mote Decl., Ex. C, 133-34). The Montrose defendants explain that they simply do not have the man-power to keep any semblance of traditional corporate records. (*Def.Resp.,* at 1, 8, 9-10).

This absence of records not only supports Lorillard's alter ego theory, but creates conditions that are ripe for the commingling of assets. Mr. Hazemi

does not bother to maintain a personal bank account; instead, he draws cash as needed from Montrose. (Mote Decl ., Ex. D, at 190). The Montrose defendants explain that they account for this as a "management fee" on tax returns. (*Def.Resp.,* at 4). There is no evidence that the Montrose defendants kept any record of Mr. Hazemi's cash withdrawals, however, and, as just noted, the tax returns are prepared without corroborative financial data and have not been filed since 1999. Mr Hazemi testified that the money in his wife's checking account came from Montrose as well. (Ex. D, at 192). But, Mrs. Hazemi swore that she has *never* received any money from Montrose and, more specifically, that she has never been paid for working at Montrose. ( *Def.Resp.,* Ex.8). Thus, there is no telling what the funds in her checking account represent. Neither Mr. nor Mrs. Hazemi, then, seem to acknowledge that Montrose is a separate entity from themselves when it comes to Montrose's money.

**\*16** Montrose's banking practices allow for the commingling of assets as well. During discovery, Mr. Hazemi maintained that Montrose did all its banking at one bank. (Mote Decl., Ex. D, at 188, 194). Lorillard's own efforts revealed that Montrose had accounts at two other banks as well. The Montrose defendants suggest that there was nothing secretive about these accounts; they did not disclose them because they were merely "ancillary" accounts. (*Def.Resp.,* at 10). They claim to have used one "ancillary" account to deposit over $8 million from checks Montrose wrote to itself on its Labe Bank account, but have produced no records of that activity. (*Def.Resp.,* at 5). Lorillard's third-party discovery efforts have revealed the other "ancillary" account was home to approximately $ 1 million in transactions over a twenty-month period. (Mote Decl., Ex. M). Nearly $10 million is quite a bit of activity for a couple of undisclosed, ancillary accounts, especially when the Hazemis feel free to help themselves to cash from Montrose without any accounting or records of their withdrawals. And, the fact that Mrs. Hazemi owns the property that houses Montrose, after a long and serpentine series

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)
**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

of transactions involving an individual under indictment for defrauding mortgage lenders, does not escape the court's attention. Her ownership is made all the more suspicious by the fact that Mr. Hazemi testified his wife owned no property other than the family home in Lombard and an interest in her family's home in Canada. And, as has recently been made clear by the revelations regarding the 3019 N. Rose St. property, this is not the only property ownership the Hazemis have covered up.

The evidence Lorillard has advanced in this matter demonstrates that, with respect to Montrose, the Hazemis have disregarded corporate formalities, have kept no corporate records, and have treated corporate funds as their own. Judge Aspen has already found that there is a likelihood that Lorillard will succeed on it Lanham Act claims, and there have been no further developments that would counsel a revision of that opinion. Based the record in this matter, the court finds that Lorillard has not only established a likelihood of success on the merits of its Lanham Act claims, but as to it "alter ego" theory as well.

## B
### Inadequate Remedy at Law and Irreparable Harm

Next, Lorillard must show that it has no adequate remedy at law and, as a result, that it will suffer irreparable harm if the injunction is not issued. *FoodComm Intern. v. Barry,* 328 F.3d 300, 304 (7th Cir.2003). "Inadequate remedy at law does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered." *FoodCom Intern.,* 328 F.3d at 304. In this case, the Lanham Act provides Lorillard with the equitable remedy of recovering the Montrose defendants' profits. In such cases, courts have generally concluded that an asset freeze is appropriate to ensure that permanent equitable relief will be possible. *Levi Strauss & Co. v. Sunrise Intern. Trading Inc.,* 51 F.3d 982, 987 (11th Cir.1995); *Reebok Intern., Ltd. v. Marnatech Enterprises, Inc.,* 970 F.2d 552, 559 (9th Cir.1992).

*17 The evidence discussed above demonstrates that the Hazemis are hardly circumspect about segregating their assets from those of Montrose. Corporate financial records are non-existent, bank accounts go undisclosed. Clearly, the remedy of disgorgement of profits will be less than inadequate if the Hazemis continue to treat the Montrose coffers as their own and relieve Montrose of its corporate assets. In addition, especially given the Hazemis' disregard for corporate bookkeeping, the profits at issue in this regard might become all but untraceable, if that is not already the case.

Finally, it is clearly not beyond the Hazemis to lie about the very ownership of assets. They have done so recently and repeatedly. It is not unusual, in a Lanham Act case, for a court to freeze assets where there is evidence that the defendants "may hide their allegedly ill-gotten funds if their assets are not frozen." *Reebok Intern., Ltd. v. Marnatech Enterprises, Inc.,* 970 F.2d 552, 563 (9th Cir.1992). This is not a case where there is a mere threat of the Hazemis hiding their assets; Lorillard has demonstrated that they are already actively doing so, and attempting to cover their trail with more deception. It is the Hazemis that have brought this case to this brink. They have seen to it that there is no other way to preserve the *status quo* but an asset freeze. Accordingly, the court finds that Lorillard has established that it has no adequate remedy at law and will suffer irreparable hardship without a freeze of the Hazemis' assets.

## C
### Balance of Harms to the Respective Parties

In balancing the harms, the court must weigh the error of denying a preliminary injunction to the party who would win the case on the merits against the error of granting an injunction to the party who would lose. *FoodComm Intern.,* 328 F.3d at 305. In so doing, the court bears in mind that the purpose of a preliminary injunction is "to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *AM General Corp. v. Daimler-Chrysler Corp.,* 311 F.3d 796, 804 (7th Cir.2002).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)
**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

In this case, there is no doubt that the Hazemis will suffer harm if their assets are frozen. But it is a harm they have brought upon themselves with their tactics of deception and underhandedness. Just how to quantify that is a difficult question because the Hazemis have not addressed the issue. But this much is certain: the Hazemis have had a rather long string of chances to end their pattern of deception in this litigation: the court has given them the benefit of the doubt time and again. They have chosen to blatantly lie, in depositions and in open court. The balance of harms, by far, favors the protection of Lorillard's rights by the issuance of an order freezing the Hazemis' assets.

The court also notes that, in balancing the harms to the parties, the greater a movant's chances of success on the merits, the less strong a showing it must make that the balance of harm is in its favor. *FoodComm Intern.,* 328 F.3d at 303. As the court's foregoing discussion reveals, Lorillard has made a rather strong showing that it will succeed on the merits of this case. Accordingly, the court grants Lorillard's motion for a preliminary injunction freezing the Hazemis' assets in this case. Lorillard shall submit a draft order freezing the Hazemis' assets and detailing the plan for the court's approval.

**\*18** Recognizing that the freezing of assets could work a hardship on the Hazemis, the order should make provisions for withdrawal of living expenses, and for the payment of expenses related to legitimate business operations. If the Hazemis comply with the order, and submit the necessary proof to the Court, no undue hardship need be felt by defendants as a result of the asset freeze. Moreover, the Court is free to modify or dissolve the preliminary injunction if warranted by developments in this case subsequent to the noticing of this appeal.

Although the court accepts Lorillard's arguments regarding the necessity of an asset freeze, it cannot accept the argument that no bond is necessary in this case. Under Federal Rule of Civil Procedure 65(c):

[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

The rule, as the Seventh Circuit has stated, makes security mandatory. *Gateway Eastern Ry. Co. v. Terminal R.R. Ass'n of St. Louis,* 35 F.3d 1134, 1141 (7th Cir.1994). While it is clearly within the court's discretion to fix the amount of the bond, *Id.,* the parties here have provided the court with no evidence, or even discussion, of what would constitute an appropriate amount. As such, the parties must file memoranda on this issue along with supporting documentation, in order that the court may determine a reasonable amount for security in this instance. *See, e.g. Mead Johnson & Co. v. Abbott Laboratories,* 201 F.3d 883, 887 (7th Cir.2000); *Gateway Eastern Ry. Co.,* 35 F.3d at 1142.

### III
### CONCLUSION

For the foregoing reasons, it is respectfully recommended that the plaintiff's motion-and emergency motion-for a preliminary injunction freezing the defendants' assets be granted. It is further recommended that the plaintiff be ordered to file a draft order for the court's approval, and the parties be ordered to file memoranda on the appropriate amount of the bond as per this report and recommendation.

N.D.Ill.,2005.
Lorillard Tobacco Co. v. Montrose Wholesale Candies
Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.